## MERRIAM & MILLARD CO. v. COLE.
### (No. 8713.)

(Court of Civil Appeals of Texas. Ft. Worth. Oct. 13, 1917. Rehearing Denied Nov. 17, 1917.)

1. GAMING ☞12—CONTRACT FOR FUTURE DELIVERY—INTENT—VALIDITY.

A contract for the sale of goods to be delivered at a future date is valid, even though the seller has not the goods nor any other means of getting them than to go into the market and buy them, provided the parties really intend and agree that the goods are to be delivered by the seller and the price is to be paid by the buyer; though if the real intent is to speculate and the goods are not to be delivered, but the parties are to settle according to the difference between the contract price and the market price at the date fixed for executing the contract, the contract is invalid.

2. GAMING ☞50(1)—SALE FOR FUTURE DELIVERY—ACTION FOR PRICE—EVIDENCE—DIRECTED VERDICT.

In a suit to recover a balance due under a written contract for the purchase of oats, providing for the deposit of a margin, and for an option to declare the contract at an end, where it appeared that the seller had the oats in an elevator, and that the parties contemplated a delivery, and not a settlement based upon the difference between the contract price and the market price at the time fixed for delivery or a gambling contract or a dealing in futures, the plaintiff was entitled to a verdict.

3. COMMERCE ☞40(1) — "INTERSTATE COMMERCE"—DEALING IN FUTURES—STATE STATUTE.

A written contract for the purchase of grain by defendant, a resident of Texas, from a company doing business in Nebraska, contemplating the interstate transportation and delivery of the grain, was within the rules applicable to interstate commerce; so that Pen. Code 1911, art. 539, inhibiting dealings in futures without a bona fide intent of the parties to deliver the goods, did not apply.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

4. COMMERCE ☞80—FOREIGN CORPORATIONS —INTERSTATE COMMERCE.

The laws of the state of Texas authorizing a foreign corporation to transact business or to maintain a suit therein by obtaining a permit to do so have no application to cases where the corporation's business constitutes interstate commerce.

Appeal from District Court, Denton County; C. F. Spencer, Judge.

Suit by the Merriam & Millard Company against T. A. Cole. Judgment for defendant, and plaintiff appeals. Reversed, and judgment rendered for plaintiff.

Geo. M. Hopkins, of Denton, for appellant. Sullivan & Hill and Luther Hoffman, all of Denton, for appellee.

CONNER, C. J. The appellant company instituted this suit against appellee to recover a balance of $828.54 alleged to be due under a written contract dated on the 4th day of September, 1913. By the terms of the contract, which will be later set out, appellee purchased from the appellant 15,000 bushels of No. 3 white oats at the contract price of 55½ cents per bushel for December shipment, basis Texas group 1, with the option of carrying after December 31, 1913, at a quarter of a cent per bushel for each 10 days, until May 1, 1914. Appellant alleged that it was a corporation duly incorporated under the laws of the state of Nebraska, with office and place of business in the city of Omaha, Neb., engaged in interstate commerce and carrying on such interstate commerce in the state of Texas and other states, buying and selling grain from its office in Omaha, Neb., to parties residing in other states of the Union, including the state of Texas, making contracts for the sale of corn, wheat, oats, and other grain, and delivering such grain under such contracts into the state of Texas and other states from its elevators at Omaha, Neb., as interstate commerce. The appellee answered by general denial and a special answer, alleging that the appellant was a foreign corporation not authorized to transact business or maintain suit in the state of Texas, in that it had not secured a permit under our laws to do so, and further that the contract of sale sued upon was a gambling contract and did not constitute interstate commerce. The case was tried before a jury

upon special issues, which were so answered as to sustain the special defenses urged by appellee, whereupon the court entered judgment in appellee's favor, from which judgment this appeal has been prosecuted.

A number of questions are presented which, in view of the conclusion reached by us, need not be noticed. The controlling question, as we view the case, is presented by appellant's fourth assignment urging error to the action of the court in refusing to give a peremptory instruction to find for the plaintiff in the suit, as was duly requested in writing. We are of opinion that this assignment must be sustained.

The contract upon which appellant based its suit is as follows:

"Omaha Grain Exchange Official Contract.
"Merriam & Millard Company,
Grain Merchants.
"No. ――.　　　Omaha, Sept. 4th, 1913.
"T. A. Cole, Frisco, Texas:

"We herewith confirm sale to you: Quantity ―― cars ―― 15,000 bushels. Grade, No. 3 white oats. Price, 55½¢ per bushel of 32 pounds. Basis, Texas group 1. Time of shipment: December shipment, buyer's option. Routing: ――. Remarks: Privilege of carrying after December 31st at a quarter of a cent for each ten days to May 1st.

"Omaha Grain Exchange weights and grades to govern.

"Payment by demand draft with documents attached.

"It shall be the duty of the buyer to furnish shipping directions immediately or upon request of the seller, and if the buyer fails to furnish directions, in accordance with this agreement, the seller reserves the right, without further notice to the buyer, to cancel the contract, charging loss, if any, to the buyer, or to sell same for the buyer's account.

"This transaction is made under the rules, regulations and customs of the Omaha Grain Exchange of the City of Omaha. Any claims or differences to be settled under rules and regulations of the Omaha Grain Exchange of the City of Omaha in Omaha.

"Shipping terms are defined by the Omaha Grain Exchange as follows:

"Three days shipment shall mean within three calendar days at place of shipment.

"Five days shipment shall mean within five calendar days at place of shipment.

"Ten days shipment shall mean within ten calendar days at place of shipment.

"Excluding the date of sale, time of shipment shall be figured from date full shipping directions are received at Omaha.

"Sale or purchase of grain for which shipment or delivery may extend beyond ten (10) days from date of contract, to be subject to the 'Rules Governing Cash Margin Calls' as printed on back hereof.

"Manifest errors excepted.
"Merriam & Millard Co., Per ――.

"Rules Governing Cash Margin Calls.

"Regulation 16. On purchase or sale of grain, feeds, or seeds, for which shipment or delivery extends beyond ten (10) days from date of contract, said contract shall state that either buyer or seller may call for margins to the market, and release such margins to the market until final adjustment has been made; and all such contracts shall contain the following:

"First. It is agreed that either party to this contract may call for a marginal deposit to the market, same to be released when market jus-tifies. In cases wherein more than one contract has been made, deposit call and subsequent calls for the releasing of same shall not exceed the net aggregate difference owing by one party to the other on all contracts open and amenable to this rule.

"Second. Said margin when called by a resident member of the Omaha Grain Exchange shall be deposited with the secretary of the Omaha Grain Exchange and shall be subject to the rules of the Omaha Grain Exchange governing the depositing and releasing of margins. Nonresidents may deposit with the secretary of the Omaha Grain Exchange or in any banking institution properly designated as a depository for margins. Margins must be deposited within twenty-four (24) hours as herein provided; legal holidays in either buyer's or seller's place of business shall not be counted. Nonresidents of Omaha, Neb., may remit by telegraphic transfer or by mail remittance if preceded by telegraphic notification from (his or their) local bank that such remittance has been made.

"Third. Party making marginal deposit must advise the secretary of the Omaha Grain Exchange immediately, giving name of party for whose protection the deposit is made.

"Fourth. In case marginal deposit call to the market is not deposited and official notice of same is not received within twenty-four (24) hours, as hereinbefore provided, the party thus calling shall have the privilege to cancel all contracts covered by such margin call at the general market value, or to resell or rebuy at his or their option, under prompt telegraphic advice, charging difference or loss to the defaulting party, said amount to be due and payable at once.

"Fifth. All margins shall be immediately released upon faithful performance of the contract.

"Sixth. Where contracts for future delivery of grain include a carrying charge, such carrying charge must be paid and collected at the expiration of each thirty day period.

"Seventh. A committee of three shall be appointed by the president, to whom all disputes as to a proper marginal price, or any other feature connected with cash margins, shall be referred.

"Omaha banking institutions authorized by the board of directors as depositories for margins: Omaha National Bank. United States National Bank. First National Bank. City National Bank. Merchants' National Bank. Corn Exchange National Bank. Nebraska National Bank."

The contract was indorsed on its face, "Accepted," and signed by the appellee, T. A. Cole.

Appellee, among other things, testified:

"How I happened to enter into this contract, I never gave it a thought and didn't know anything about it. * * * I was working over at Frisco in a house that I owned, and about 2 o'clock, on the 1st of September, Mr. Shrader came in where I was at work, and he said, 'Cole, don't you want to make some money?' and I said, 'Certainly, I would like to make some money.' and he said, 'I can put you onto something where we can make some money.' He told me he had an oat deal, and I told him that I didn't know anything about it, and I said: 'I will just trust it to you; you have been handling grain here.' And he said: 'Now, Cole, I will handle this deal for you, and you will never have to touch an oat; you will just be buying it like you were buying spot cotton, but you will never have to touch an oat.' He told me that I would have to put up $300 on 15,000 bushels, and he said, 'I will phone it in to Galbraith,' and as I started home that evening I gave him a check for $300, and in a day or two these papers came back, and they were signed up, and I never even read the contract, because I was looking

to Shrader to handle that for me. I never paid any attention to the matter, so I got a letter then from Merriam & Millard, stating that they wanted a margin, and I went and called Fount up then, and I said: 'Fount, this here thing looks rocky to me. I don't know anything about it, and it looks rocky to me.' And he said: 'I would have nerve, Cole; I would stay with it.' I said, 'I went into it on your statement, and if you think there is a chance for me not to lose out, I will just take your advice,' and I put up $400 or $450 more and it rocked along. Now, I had bought a lot of cotton from my renters, and it laid out in the rain, and I was in hard shape, and I went to Fount and said, 'Fount, I want you to get me out of this, I want to get out of it,' and he said, 'I will do all I can for you,' and I went down to see Mr. Galbraith and told him that I wanted to get out of it, and he said, 'I will take the matter up, but I haven't got a thing in the world to do with it,' and then I just set down and wrote those fellows that I had turned this matter over to Sullivan & Hill. * * *

"If Shrader hadn't told me that I wouldn't have to handle an oat, I wouldn't have made the deal. I went into this deal because Shrader came to me, and I thought he was a friend of mine and it was going to make me some money and that I need not to be bothered with it. It wasn't my intention to have one actual oat shipped to me, because I didn't have any place for oats. I wasn't in the grain business or milling business. I am a farmer by occupation; am a farmer now, and was then. * * *

"Mr. Shrader and I didn't buy the oats together; Shrader didn't have anything to do with the oats. I didn't buy any oats with Shrader; I think Mr. Shrader bought some oats before— when he came in he said, 'I will put you onto a deal where you can make some money,' and he told me that he had bought some of them, and I said, 'If you think I can make some money, I will take some.' I don't know whether or not it looked like at that time oats were going up; I wasn't posted on the market, but Shrader said he thought they were going up. As to whether it didn't look like the cotton market was going up, too, at that time, will say I don't remember about the cotton, whether it looked like it was going up or not. It is true I was buying some cotton that year and was holding it. It is true I bought some oats, too; the only oats I bought, however, was on this deal here, the oats I bought from Merriam & Millard Company.

"As to whether it is not a fact that if the price of oats had gone up I would have expected those people to deliver the oats to me, will say I didn't want the oats; I was dealing for the profit in the oats; I didn't want any oats, because I had no place for that many oats. Fount Shrader told me that I wouldn't have to handle the oats; he said, 'I will handle the deal for you.' As to whether it is not a fact that I expected to make a profit, will say that is why I went into it; he said I could make some money. I didn't want the oats. It is true that Merriam & Millard Company didn't mention anything about not delivering the oats in the contract. * * *"

Beside several letters which passed between the parties, all of the other testimony was by deposition on the part of witnesses who testified in behalf of appellants. Various officers and employés of the appellant company testified by deposition, as stated, to the effect that the appellant company was engaged in the business of buying and selling grain for cash at Omaha, Neb., and had been so engaged since the organization of the company in 1910 or 1911; that the company op-

erated a large terminal elevator at Omaha, buying, storing, and selling grain; that the contract hereinbefore set out had been mailed direct to T. A. Cole at Frisco, and was by him executed and returned to the company by mail; that T. A. Cole at no time furnished shipping instructions or accepted the oats under the contract prior to December 31, 1913; that the oats were held in storage for the account of Cole after December 31, 1913, until March 16, 1914, upon which date the Merriam & Millard Company received notice that T. A. Cole refused to have anything further to do with his contract; that the oats were thereupon sold by the Merriam & Millard Company for the account of T. A. Cole at the average price of 38 cents per bushel at Omaha; that the proceeds of the sale plus the margins placed by T. A. Cole with the secretary of the Omaha Grain Exchange, $750, plus $1,350 in adjustment of freight, was credited to the account of Cole, leaving a balance due from Cole to the appellant company under the terms of the contract in the amount for which the suit had been instituted.

The depositions were to the further effect that all of the appellant company's business was transacted from its office in Omaha, Neb., that being the only office maintained by the company; that the company did not transact and does not transact business in the state of Texas, all transactions with Texas firms being conducted from the Omaha office; that the company does not deal in futures nor are its contracts gotten up for the purpose of concealing the real intent of the parties; that from September 4, 1913, to December 31, 1913, they actually had on hand in their elevator at Omaha from 265,700 bushels to 313,000 bushels of No. 3 white oats; that on December 31, 1913, the company had in said elevator 245,000 bushels, and at all times later could, and would, have filled appellee's contract and shipped him the number of bushels of oats as therein called for had appellee given them shipping orders that would have enabled them to so deliver; that such was the intention of the company and the only reason no such delivery was made was that the company never received instructions from Cole as to when or where he wished the oats shipped, as provided in the written contract, and that the time had not expired on his contract when he notified the company that he would not fulfill his part of it and accept the oats at the contract price; that under the rules of the Omaha Grain Exchange each party to the contract under consideration was required to and did deposit with the secretary of the Omaha Grain Exchange $750, which covered the deposit to be made under the contract up until the time Cole repudiated it. The depositions further disclosed that, in addition to the contract with appellee, the appellant company was also under contract for the delivery of No. 3 white oats to a

number of other Texas persons and firms in Houston, Ft. Worth, El Paso, Frisco, Sherman, Dallas, Marshall, Greenville, Corsicana, and San Antonio, aggregating 303,750 bushels, at which time the company had on hand in its elevator at Omaha approximately 375,000 bushels of No. 3 white oats.

It was further shown by the depositions that the appellant company daily sent quotations of prices on grain by telegraph to various parties at different places in Texas; that these persons repeated the quotations to such other persons as might desire to purchase grain, and, if such persons indicated a desire to purchase grain at prices quoted, the company was notified by telegraph to that effect; the company thereupon sent by mail to each of such proposed purchasers duplicate copies of a contract, stating the terms of sale, with instructions to sign one of said copies and return to the company at its office in Omaha, Neb.; that it had no representative in Texas with any other or further power than to give such quotations. Neither "Fount Shrader" nor "Galbraith" mentioned in appellee's testimony was called to testify.

[1] We find nothing on the face of the contract itself nor in the evidence which authorizes the conclusion that the transaction under consideration was a gambling transaction.

"The generally accepted doctrine in this country is, as stated by Mr. Benjamin, that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them; but such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller and the price to be paid by the buyer; and if, under guise of such a contract, the real intent be merely to speculate, in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager and is null and void." Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225.

See, also, Clews v. Jamieson, 182 U. S. 461, 21 Sup. Ct. 845, 45 L. Ed. 1196. In the case last cited and on the same page of the law edition referred to, it was further said:

"As a sale for future delivery is not on its face void, but is a perfectly legal and valid contract, it must be shown by him who attacks it that it was not intended to deliver the article sold, and that nothing but the difference between the contract and the market price was to be paid by the parties to the contract. And the fact that at the time of making a contract for future delivery the party binding himself to sell has not the goods in his possession and has no means of obtaining them for delivery, otherwise than by purchasing them after the contract is made, does not invalidate the contract."

It was there also said:

"In order to invalidate a contract as a wagering one, both parties must intend that instead of the delivery of the article there shall be a mere payment of the difference between the contract and the market price."

The law as stated in the quotations made seems abundantly supported by other authorities. See 2 Elliott on Contracts, § 995; 6 R. C. L. § 188; Burr v. Davis, 27 S. W. 589.

[2] The contract declared upon, as it seems to us, is easily distinguishable from that class of contracts commonly understood as gambling contracts in futures. It is undisputed that the appellant company was actually engaged in the sale and delivery of actual grain at the time owned and held by them in their own elevators; that they sold such grain to numerous persons not only in Texas, but in other states. It is scarcely to be doubted that, had the fluctuations of the market been in favor of the appellee, he could have legally demanded and enforced delivery of the 15,000 bushels of oats for which he contracted; or, in case of a refusal to deliver, had the remedies provided for him in the contract, including a right of action for damages. The fact that the contract provided for the deposit of "margins" does not invalidate it. See 2 Elliott on Contracts, §§ 1002, 1003, and cases cited in the notes. See, also, 6 R. C. L. § 189. Nor can it make any difference, as we think, that under the terms of the contract under certain circumstances the parties had the option to declare the contract at an end. The deposits of margins as shown by the testimony was with the secretary of the Omaha Grain Exchange, and so provided for the mutual protection of the parties to the contract against fluctuations in the market; and the fact that the plaintiff company under the rules of the Grain Exchange and by the terms of the contract had the right, upon appellee's refusal to increase his margin, or to pay storage fees, to declare the contract at an end and to sell the grain for the account of the appellee, does not establish the invalidity of the contract. Such provisions on their face seem in no way inconsistent with fair dealing, but, on the contrary, are entirely consistent with business prudence and legal procedure. The options given to declare the contract at an end were reciprocal; that is, either party thereto was given the right to so declare upon default of the opposite party. Neither party was given the absolute right of cancellation at will, nor could either party force an exercise of the opposite party's option. In other words, as before stated, on its face the contract seems valid, and nothing appears therefrom indicating a want of intention to actually deliver the grain contracted for at the time and under the circumstances specified in the contract. It is true, as appellee sought to do, it was competent to show by proof that neither party contemplated an actual delivery of the grain, and appellee's testimony was to the effect that he had no purpose of receiving the grain; but, as we have seen from the authorities cited, his intention and purpose alone are insufficient to invalidate the contract. It was essential that he should have established an intent on the part of the appellant company not to deliver the grain as it had contracted to do. Indeed, it is not

very clear that appellee, himself, had an unlawful intent. His testimony is susceptible of the construction that he merely trusted his friend, Fount Shrader, to "handle" the deal for him, which Fount Shrader could have satisfactorily done had prices advanced by an actual receipt and disposition of the grain at Frisco without any actual delivery to appellee. At all events, there is nothing in the testimony that indicates that the appellant company, through its managing officers, or otherwise, had any notice of appellee's expressed intent, even though such intent was in contravention of the public policy against gambling transactions. Appellee nowhere testifies that he notified Galbraith, or any other representative of the appellant company, of his expressed purpose, or that Fount Shrader gave any such notice.

Appellee insists, however, that the transaction under consideration comes within the purview of article 539 of our Penal Code, inhibiting dealings in futures. That article forbids a sale or purchase of any cotton, grain, meat, lard, or stocks or bonds of any corporation, to be delivered in the future, when it was not the bona fide intention of the party being prosecuted at the time that such sale, contract, purchase, or offer to sell or purchase, was made, that the thing mentioned in such transaction should be delivered and paid for as specified in the transaction, and further declares that:

"Any such sale, purchase, offer or contract, where it was the intention of the party being prosecuted hereunder at the time of making such contract or offer, that the same should, or, at the option of either party, might be settled by paying or receiving a margin or profit on such contract."

It may be well doubted, at least, whether the transaction under consideration falls within the meaning of the article of the Penal Code invoked, for, assuming that the appellant company is the party prosecuted, there is nothing in the evidence, as we have already seen, indicating that it was not appellant's bona fide intention to deliver the grain as it had contracted to do. Nor is there anything on the face of the contract or in the evidence, as we construe it, establishing the proposition that either appellant company or appellee had the option of settling the transaction by merely paying or receiving a margin or profit on such contract. True, margins were provided for in sums as stated, but nothing in the contract, or in the evidence, indicates that had there been some sudden and great fluctuation in the market price, either one way or the other, not sufficiently covered by the margins actually deposited, that the losing party would be relieved of all liability by a mere surrender of the margin that had been deposited by him.

[3] But whatever merit there may be in this view, we think the article of the Code quoted cannot be made to apply here for the reason that the transaction falls within the rules applicable to interstate commerce. If it does, it will not be contended that our local statute is operative, for in such cases it is otherwise well settled in the authorities. But it is insisted in behalf of appellee that a distinction is to be made between the contract we have under consideration and interstate commerce. It is insisted that the contract itself does not constitute interstate commerce. Viewed alone and disassociated from other circumstances in the case, the distinction is apparent and might be properly indulged. As we have observed before, however, the contract under consideration contemplated the actual transportation and delivery of the subject-matter of the contract from the state of Nebraska to the state of Texas, and in this respect differs from that class of contracts for the purchase and sale of futures that may be settled by mere adjustment of margins.

In the case of Sioux Remedy Co. v. Cope, 235 U. S. 197, 35 Sup. Ct. 57, 59 L. Ed. 193, it was, among other things, said:

"The right [of a foreign corporation] to demand and enforce payment for goods sold in interstate commerce, if not a part of such commerce, is so directly connected with it and is so essential to its existence and continuance that the imposition of unreasonable conditions upon this right must necessarily operate as a restraint or burden on interstate commerce."

As it seems to us the principle embodied in the quotation has application here. It is true no grain under the terms of the contract was actually transported, but the contract was a lawful one and very intimately connected with the subject of the interstate commerce contemplated and contracted for. Indeed, the contract is the very foundation of the appellant's right of recovery in this case. Without contracts and guaranties between parties to such transactions, it would seem difficult and wholly impracticable to engage in interstate commerce at all. It is matter of common knowledge that a great volume of our interstate commerce is dependent upon the guaranties afforded by contracts for the sale and delivery of the merchandise transported. Had the grain specified in the contract under consideration been actually shipped and delivered at Frisco, as provided in the contract, it could hardly be contended, we think, that the transaction did not fall within the rules applicable to interstate commerce, and we do not think that appellee by a default on his part can constitute the transaction differently.

[4] What we have said in disposing of appellee's contention that the transaction under consideration falls within the meaning of article 539 of the Penal Code sufficiently disposes of appellee's further defense that the appellant company could not lawfully maintain this suit because of its failure, which was shown by the proof, to take out a permit to do business in this state, as provided by our laws relating to foreign corporations. These laws, as has been so frequently de-

cided as not to require the citation of authorities, can have no application in cases of interstate commerce. Moreover, it may well be doubted whether the evidence is susceptible of the construction that the appellant company was doing business within this state within the meaning of the laws referred to.

On the whole, we conclude that the court should, under the undisputed evidence, have peremptorily instructed the jury to render a verdict for the appellant company, and, it being our duty to here render such judgment as the lower court should have rendered, it is ordered that the judgment below be reversed, and judgment here rendered for appellant as prayed for; there being no dispute in the evidence as to the amounts claimed.

Reversed and rendered.