LTV FEDERAL CREDIT UNION,
Plaintiff and Counter-Defendant,

v.

UMIC GOVERNMENT SECURITIES,
INC., and Banco de la Nacion Argenti-
na, Defendant and Counter-Claimants,

UMIC GOVERNMENT SECURITIES,
INC., and Banco de la Nacion
Argentina, Plaintiffs,

v.

LTV FEDERAL CREDIT UNION,
Defendant.

Civ. A. Nos. CA–3–80–0795–G,
CA–3–80–1094–G.

United States District Court,
N. D. Texas,
Dallas Division.

Sept. 1, 1981.

Jim K. Choate, Brice & Barron, Dallas, Tex., for plaintiff.

Chas. Haworth, Johnson, Swanson & Barbee, Dallas, Tex., Kerry C. Smith, Pettit & Martin, San Francisco, Cal., for Banco de la Nacion Argentina.

S. Shepherd Tate, W. Thomas Hutton, Shepherd D. Tate, Martin, Tate, Morrow & Marston, Memphis, Tenn., Chas. P. Storey, Francis W. Thayer, Storey, Armstrong, Steger & Martin, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

PATRICK E. HIGGINBOTHAM, District Judge.

These consolidated actions arise out of the breach of a standby commitment agreement ("Standby Commitment") between LTV Federal Credit Union ("LTV") and UMIC Government Securities, Inc. ("UMIC"). LTV seeks a declaratory judgment that the Standby Commitment is unenforceable. UMIC and Banco de la Nacion Argentina ("Banco") seek damages of $1,146,250, pre-judgment interest, and their reasonable attorneys' fees and court costs. This Opinion sets forth this court's findings of fact and conclusions of law. Fed.R. Civ.P. 52(a).

### I.

On June 26, 1978, LTV, a federal credit union doing business in Texas, and UMIC, a Tennessee corporation organized for the purpose of transacting business in government securities, entered into a contract described as a standby commitment. Under the terms of that agreement, LTV, upon twenty days notice, is obligated to take delivery and pay for on June 22, 1980, $4,000,000 principal amount (plus or minus 2.5%) 8.5% Government National Mortgage Association securities ("GNMA's") at a price of 101% of the principal amount. The Standby Commitment contains what is commonly known as a yield maintenance clause. The clause permits UMIC to deliver GNMA's bearing an interest rate other than 8.5% should the Federal Housing Administration ("FHA") mortgage rate change during the period of the Standby Commitment, provided that the new rate GNMA's are delivered at a price producing an equivalent yield (in this case 8.314%). The Standby Commitment also provides that LTV will maintain a margin, with UMIC having the right to call for additional margin payable within forty-eight hours. In consideration for obligating itself to take delivery of the GNMA's at UMIC's option, LTV receives a $200,000 non-refundable commitment fee. The agreement provides that it shall be construed, and the rights and liabilities of the parties determined, in accordance with Tennessee law.

Contemporaneously with the execution of the Standby Commitment, UMIC entered into a similar agreement with Banco under which UMIC is obligated to take delivery and pay for on June 22, 1980, $4,000,000 principal amount (plus or minus 2.5%) 8.5% GNMA's at a price of 101% of the principal amount. The terms of the Banco-UMIC standby commitment are identical to those of the UMIC-LTV Standby Commitment, except that Banco must give thirty days notice of its intent to deliver, UMIC receives a commitment fee of $240,000, and no margin is required.

At the time of the execution of the Standby Commitment, LTV assigned to UMIC $250,000 (principal amount) of bonds as margin. On July 28, 1978, UMIC paid LTV the $200,000 non-refundable commitment fee.

During the approximately two year period of the Standby Commitment, the market for GNMA's declined, in large part due to increasing interest rates. FHA mortgage rates fluctuated between 9%, the rate prevailing at the time of the agreement, and 13%; GNMA coupon rates fluctuated between 8.5% and 12.5%. In July of 1980 the prevailing GNMA coupon rate was 11%, with GNMA's available on the market bearing coupon rates of 8.5%, 9%, 9.5%, 10%, 11% and 12.5%.

As interest rates rose, LTV's potential loss under the Standby Commitment increased (as did UMIC's potential loss in its standby commitment with Banco). On April 6, 1979, UMIC called for additional margin, which LTV met by assigning to UMIC $500,000 (principal amount) of bonds. On February 12, 1980, UMIC again requested LTV to post additional margin so as to

bring the total to $1,520,000. LTV denied the margin call, and instead demanded clarification of its obligations under the Standby Commitment. After an exchange of correspondence, UMIC gave written notice by letter dated March 24, 1980, that it would deliver the GNMA's pursuant to the Standby Commitment. On June 17, 1980, LTV informed UMIC that it would not take delivery or pay for the GNMA's. One week later, LTV filed its Complaint seeking a declaratory judgment that the Standby Commitment is unenforceable.

As a result of LTV's breach, UMIC refused to take delivery of the GNMA's tendered by Banco in July of 1980 pursuant to its standby commitment with UMIC. At least initially, UMIC took the position that Banco had failed to provide proper written notice of its election to deliver the GNMA's, and that UMIC, therefore, was not obligated to take the securities. UMIC agreed, however, to accept the Banco GNMA's if LTV would honor its Standby Commitment with UMIC. UMIC and Banco eventually settled their dispute, with UMIC assigning to Banco its rights in this action to the extent of $800,000 plus interest, expenses and attorneys' fees.

## II.

LTV raises six grounds in support of its request for declaratory relief:

(1) That T. O. Johnson, LTV's General Manager from 1976 through 1979, did not have the requisite authority to make the Standby Commitment on behalf of LTV.

(2) That LTV did not have the statutory authority in June of 1978 to enter into this type of transaction.

(3) That UMIC violated § 5 of the Securities Act of 1933 ("Securities Act") and Article 581–7 of the Texas Blue Sky Act by dealing in unregistered securities.

(4) That UMIC violated § 5 of the Securities Exchange Act of 1934 ("Exchange Act") and Article 581–12 of the Texas Blue Sky Act by acting as a broker-dealer in connection with the issuance and sale of the Standby Commitment without being regis-

tered as either a broker-dealer or an exchange.

(5) That UMIC violated §§ 10(b), 15(a) and 15(c) of the Exchange Act and Rule 10b–5 by: (a) knowingly misrepresenting to LTV that the GNMA's would not be delivered, and (b) knowingly failing to disclose the standby commitment with Banco, and

(6) That the Standby Commitment is an illegal and unenforceable contract under Tennessee gaming statutes.

In addition to its claim for damages under the Standby Commitment, UMIC alleges that LTV violated § 10(b) of the Exchange Act and Rule 10b–5 if LTV and T. O. Johnson, in fact, lacked authority to enter into the Standby Commitment, and that the directors of LTV are individually liable for such fraud as controlling persons within the meaning of the Exchange Act and as aiders and abettors. LTV denies that UMIC has been damaged in the amount claimed.

### T. O. Johnson's Authority

The question of Johnson's authority to make the Standby Commitment is relatively straightforward. The evidence shows that LTV's Board of Directors gave LTV's General Manager the requisite authority to enter into these type of transactions; adopted an investment policy permitting standby commitments; and sent to UMIC, Inc. (UMIC's parent) a copy of a corporate resolution authorizing Johnson to transact securities business on behalf of LTV. LTV entered into a number of standby commitments before and after this agreement, and while LTV's Board of Directors may or may not have been aware of this particular standby commitment at the time of its execution, they were aware of Johnson making such investments for LTV. LTV, through Johnson, entered into numerous securities transactions with UMIC and UMIC, Inc., including other standby commitments, but never suggested before this suit that Johnson lacked authority to transact such business. Moreover, LTV's Board of Directors was aware of the Standby Commitment for over a year before the

breach, yet remained silent as to Johnson's lack of authority; all the time, of course, retaining the $200,000 commitment fee paid to LTV. LTV thus "played the market" for a year, only denying Johnson's authority once it became evident that the market had turned against it—a risk it had been paid $200,000 to take. This court finds that Johnson had the requisite authority to make the Standby Commitment, and, alternatively, if he lacked such authority at the time the agreement was executed, LTV is estopped by its later conduct from asserting the defense. *See generally Restatement (Second) of Agency* § 103 (1958).

### LTV's Authority

LTV contends that at the time it entered into the Standby Commitment it had no authority to do so under the Federal Credit Union Act, 12 U.S.C. §§ 1751 *et seq.*, and that it, therefore, cannot be bound by the agreement.

As a federal credit union, LTV's powers are limited by federal statute; specifically, by 12 U.S.C. § 1757. That section provides in pertinent part:

A federal credit union ... shall have power—

(1) to make contracts;

\* \* \* \* \* \*

(7) to invest its funds ... in obligations, participations, or other instruments of or issued by, or fully guaranteed as to principal and interest by, ... the Government National Mortgage Association ... ;

\* \* \* \* \* \*

(15) to exercise such incidental powers as shall be necessary or requisite to enable it to carry on effectively the business for which it is incorporated.

UMIC contends that because LTV was expressly authorized to invest in GNMA's, it had the power under paragraphs (1) and (15) of § 1757 to purchase GNMA's through standby commitments. LTV argues that it was without authority to enter into the Standby Commitment because § 1757 does not *specifically* identify such agreements as permissible investments.

Any judicial construction of § 1757 must account for the interpretations of the statute made by the National Credit Union Administration ("NCUA"), the federal agency charged with prescribing rules and regulations for the administration of the Federal Credit Union Act. 12 U.S.C. § 1766(a). The parties have stipulated that at the time the Standby Commitment was executed, the NCUA "interpreted the Federal Credit Union Act as authorizing Federal Credit Unions, such as LTV Credit Union, to enter into and consummate GNMA standby commitments." In 1979, however, apparently as a result of volatile interest rates and speculative conduct by some federal credit unions, the NCUA promulgated a regulation prohibiting federal credit unions from entering into standby commitments to purchase or sell securities. *See* 12 C.F.R. § 703.3(b)(2). At the time it issued the final rule, the NCUA cautioned that the rule "is not retroactive and, therefore, does not affect transactions entered into prior to the effective date [July 20, 1979]." 44 *Fed. Reg.* 42,676 (July 20, 1979). Federal credit unions that had made standby commitments were informed that they should meet their commitments, and "begin to wind-down those activities in a safe and orderly manner." *Id.*

The Federal Credit Union Act gives the NCUA broad regulatory authority over federal credit unions. The NCUA is charged with supervising the financial soundness of federal credit unions, and each federal credit union is required to submit annual financial reports to the NCUA as well as open its books and records to NCUA inspection. 12 U.S.C. § 1756. The NCUA may suspend or revoke the charter of any federal credit union, or place the credit union in involuntary liquidation, upon finding that the credit union has violated any provision of the Federal Credit Union Act or any NCUA regulation issued thereunder. 12 U.S.C. § 1766(b)(1).

In making policy pursuant to its authority, the NCUA must balance the need to protect the financial integrity of federal

credit unions against the need for sufficient investment flexibility for federal credit unions operating in a competitive money market. Because the NCUA operates in a dynamic environment of evolving investment instruments, regulatory prescience almost is required. Investments which initially appear reasonable and safe, may, under changed economic conditions, and with the benefit of experience, later be found speculative and unsound. It is not surprising that Congress has given the NCUA broad regulatory latitude. Accordingly, in construing the Federal Credit Union Act, substantial deference must be given to NCUA interpretation.

As with most regulatory schemes, Congress has provided a skeleton to be "fleshed out" over time. Although some of the powers listed in § 1757 are set forth in detail, others beg clarification.[1] Ambiguities are inevitable, and a source of easily accessible authoritative statutory interpretation is necessary if federal credit unions are not to operate under a very real threat of potential lawsuits for *ultra vires* activity. Not only would a contrary policy inhibit federal credit unions from making investments that may be entirely consistent with the spirit of the Federal Credit Union Act, but federal credit unions most likely would find an understandable reluctance by other finan-

cial institutions to transact business with them. Finally, given the sanctions the NCUA may take against a federal credit union *which the NCUA finds* to have violated the Federal Credit Union Act, *see* 12 U.S.C. § 1766(b)(1), it is unrealistic to assume, as LTV now contends, that the NCUA's construction of the Act at the time of the execution of the Standby Commitment does not warrant judicial deference.

■ Under a literal interpretation of § 1757, LTV appears to have had the power to enter into standby commitments to purchase GNMA's. Section 1757(1) authorizes federal credit unions to make contracts, and § 1757(7)(E) authorizes the purchase of GNMA's. As UMIC notes, LTV here simply obligated itself to purchase GNMA's. The section, of course, is silent on whether such a contract may be in the form of a standby commitment or any other arrangement permitting future delivery.[2] But given that the Standby Commitment arguably is within the literal ambit of § 1757, and that the NCUA at the time construed § 1757 as permitting such an investment, this court holds, consistent with the deference due the NCUA, that LTV had the statutory authority to enter into the Standby Commitment.[3]

1. *See, e. g.,* § 1757(1) (power to make contracts), (4) (power to purchase, hold and dispose of property), (15) (power to exercise incidental powers).

2. It is unlikely that Congress had the opportunity to consider this type of transaction in granting the § 1757(7)(E) powers. The provision permitting the purchase of GNMA's was added in 1968, Pub.L. 90–448, while a standby commitment to purchase GNMA's is a relatively recent financial phenomenon.

3. The power of federal credit unions "to make contracts" obviously necessitates more detailed definition if the NCUA is to regulate the type of investments made by federal credit unions. The NCUA appears to proceed on the assumption, and one this court has no cause to disagree with, that the NCUA has the authority to determine the type of contracts permissible under the Federal Credit Union Act. For example, 12 C.F.R. § 703.3 lists a number of investment transactions, prohibiting some altogether, while conditioning others. LTV's facile argument that because the language of the Federal

Credit Union Act remains unchanged, the NCUA's determination of permissible investments must be applied retroactively, disregards the legal and financial havoc such a holding would cause. Federal credit unions which have made investments believing themselves empowered to do so, could find themselves facing liability to other contracting parties if later NCUA policy pronouncements retroactively eliminate the requisite authority. Directors of the credit unions presumably would be liable to their members for any losses incurred in such transactions. And the NCUA, in all likelihood, would be inhibited from issuing its interpretations for fear of exposing federal credit unions and individual directors to substantial liability. Absent express statutory language to the contrary, this court is unwilling to hold that NCUA policy statements permitting certain types of investments are necessarily undermined by later regulations prohibiting the same investments.

*Registration Under the Securities Act*

LTV contends that the Standby Commitment is a "security" within the meaning of the Securities Act, and, therefore, subject to registration. Because the Standby Commitment is not registered pursuant to § 5 of the Securities Act, 15 U.S.C. § 77e, LTV argues the agreement is void and unenforceable. UMIC responds that the Standby Commitment is not a "security," as defined by § 2 of the Act, 15 U.S.C. § 77b(1), and, even if it were, it is exempted from registration by § 3, 15 U.S.C. § 77c(a)(2) (exempting securities guaranteed by the United States), and § 4, 15 U.S.C. § 77d(2) (exempting transactions by an issuer not involving any public offering).

The Securities Act provides:

> [U]nless the context otherwise requires—
>
> [t]he term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(1). The corresponding definition of the Exchange Act, 15 U.S.C. § 78c(a)(10), though slightly different, is functionally equivalent. *See Tcherepnin v. Knight*, 389 U.S. 332, 336, 342, 88 S.Ct. 548, 553, 556, 19 L.Ed.2d 564 (1967).

LTV claims that the Standby Commitment is "evidence of indebtedness," an "investment contract," and a "warrant or right to subscribe to or purchase" a security (GNMA's).

It is well established that in determining whether a financial instrument is a "security," the court is not to take the "literal approach," but is to look to the economic realities underlying the transaction. *See, e. g., United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848–58, 95 S.Ct. 2051, 2058–63, 44 L.Ed.2d 621 (1975); *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1300–02 (5th Cir. 1978). The most commonly used analytical vehicle for making that determination has been the "investment contract." The touchstone of whether an instrument is a "investment contract," is "[1] the presence of an investment [2] in a common venture [3] premised on a reasonable expectation of profits [4] to be derived from the entreprenuerial or managerial efforts of others."[4] *United Housing Foundation, Inc. v. Forman, supra*, 421 U.S. at 852, 95 S.Ct. at 2060; *United Bank of Nashville v. Gunter*, 620 F.2d 1108, 1114 (5th Cir. 1980). The Court in *Forman* observed that this test "embodies the essential attributes that run through all of the Court's decisions defining a security." 421 U.S. at 852, 95 S.Ct. at 2060. *See Teamsters v. Daniel*, 439 U.S. 551, 558 n.11, 99 S.Ct. 790, 795 n.11, 58 L.Ed.2d 808 (1979) (quoting passage from *Forman*). That statement, naturally enough, has led to speculation that the elements of an "investment contract" are generic to all securities. *See* Deacon & Pendergast, "Defining a 'Security' After the *Forman* Decision," 11 *Pacific L. J.* 213, 217–18 (1980) (*Forman* combined under one definitional standard analysis "investment contract" securities and

---

4. The standard implies a certain commonality of interest between the investor and the issuer. That is, while the issuer may not always have the investor's best interests at heart once he has obtained the investor's money, the investor hopes the issuer will succeed in his business venture, for without some success, there are no profits to distribute. Here, once the Standby Commitment was made and the commitment fee paid, LTV and UMIC were financial adversaries. Any profit by either party could only come at the expense of the other. Assuming rational profit maximization by both parties, LTV could only benefit from this transaction if things went poorly for UMIC.

other types of securities as defined in 15 U.S.C. § 77b(1)); *see also Elson v. Geiger*, 506 F.Supp. 238, 231 (E.D.Mich.1980) ("investment contract" catch-all phrase); 1 Bromberg & Lowenfels, *Securities Fraud & Commodities Fraud*, § 4.6 (314) (1981) ("investment contract" broadest of statutory definitions). The Fifth Circuit, however, recently rejected that proposition, and cautioned against using the standard in a talismanic fashion. *See Meason v. Bank of Miami*, 652 F.2d 542, 547–51 (5th Cir. 1981). The Circuit's apprehensions may be the result of a more narrow construction of the "investment contract" test than that suggested in the Supreme Court's decisions.[5] But this court does not reach the issue; for the reasons stated below, whether the Standby Commitment is analyzed under an all embracing "investment contract" test, or under each of the statutory definitions, the

agreement is not a "security" within the meaning of the federal securities laws.[6]

An investment contract "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946); *see Williamson v. Tucker*, 645 F.2d 404, 417–19 (5th Cir. 1981) (word "solely" may be excised from *Howey* definition).[7] The obvious question is whether the Standby Commitment is a "common enterprise" from which LTV can "expect profits from the efforts of [UMIC] or a third party."[8] In *McCurnin v. Kohlmeyer & Co.*, 340 F.Supp. 1338, 1341 (E.D.La.1972) *aff'd per curiam*, 477 F.2d 113 (5th Cir. 1973), then district judge Alvin B. Rubin faced a similar question in the context of commodity future contracts. In rejecting the argu-

---

**5.** The Circuit may be proceeding on the assumption that the "common enterprise" element of the "investment contract" test is not met where the investor is entitled only to a fixed return rather than a percentage of profit. *Meason v. Bank of Miami, supra*, at 547–48. If such is correct, than a corporate note or bond is not an "investment contract," and the Circuit's unwillingness to apply the test across the board certainly is understandable. Arguably implicit in the Supreme Court's decisions, however, is that the existence of "common enterprise" is not dependent on whether the return is fixed. The determinative factor appears to be whether the investment transaction is so structured that the money to pay off the investor eventually will be generated by the venture or enterprise. That the investor may be entitled to a return even if the venture does not generate a profit does not alter the fact that the investment is made on the belief that the venture will succeed. Assuming such is the teaching of the Supreme Court, the differences between the Court and the Circuit appear to be primarily semantic.

*Meason* nevertheless is representative of the analytical distinction between Supreme Court and many lower court definitions of "security." The Court has been moving toward a generalized concept of "security," in what appears to be an attempt to identify a set of characteristics fundamental to all securities. In so doing, it increasingly has emphasized the economic realities underlying the transaction and deemphasized application of the individual statutory definitions. *See Teamsters v. Daniel, supra*, 439 U.S. at 558 n.11, 99 S.Ct. at 795 n.11. The lower courts, including most of the Circuits,

while recognizing the direction of the Court's movement, continue to rely heavily in their analyses on the individual statutory definitions. One result of that approach is the continuing and often contradictory endeavor to define the precise parameters of each definition so as to determine the proper "test" to apply to a given transaction. *Compare, e. g., Meason v. Bank of Miami, supra*, (distinction between "investment notes" and "commercial notes" cannot be derived from "investment contract" test) *with United American Bank of Nashville v. Gunter, supra*, (applying "investment contracts" test to determine boundaries of commercial-investment note dichotomy).

**6.** Most recently, the Fifth Circuit has withheld decision of the question of whether a contract to sell a GNMA is an "investment contract." *See G. A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 962–63 (5th Cir. 1981).

**7.** The alternative "risk capital" approach has not been adopted by the Fifth Circuit. *See Martin v. T. V. Tempo, Inc.*, 628 F.2d 887, 891 (5th Cir. 1980).

**8.** This court assumes, without deciding, that UMIC is the issuer of the Standby Commitment. The assumption may be highly questionable. The SEC, for example, in suggesting that Standby Commitments may be securities, identifies the party receiving the commitment fee as the issuer. *See* "Securities Trading Practices of Registered Investment Companies," 44 Fed.Reg. 25,128, 25,131 (April 27, 1979).

ment that such contracts are "investment contracts," the court stated:

A commodity future contract is no more or less than an option; the purchaser agrees to take delivery, or the seller agrees to make delivery, of a specified quantity of a specified commodity at a specified future time at a specified price. Unless the investor reverses his position timely by selling what he has bought or buying what he has sold, he must accept delivery of the commodity and pay the full purchase price as set by the contract (or deliver the commodity against full payment, if he has sold). He is in no way investing his money in a common enterprise, nor is he led to expect profits solely form the efforts of any third party. The "enterprise" is an individual one. The expectation of profit arises solely from the speculative hope that the market price of the underlying commodity will vary in his favor, permitting purchase or sale at a profit.

*Accord, Moody v. Bache & Co.*, 570 F.2d 523, 525–26 (5th Cir. 1978).[9]

■ This court here sees no functional distinction between the Standby Commitment and commodity contracts for future delivery, as regarding their possible status as "investment contracts," that would justify a different holding here. The economic realities of this transaction are that there is no "common enterprise"—no common business venture from which both parties can hope to generate profits to be distributed among them. And even if there were a "common enterprise," the profits each party can hope to derive, are derived solely from the movement of a market over which neither has control or the ability to influence. The Standby Commitment thus is not an "investment contract" within the meaning of the Securities Act or the Exchange Act.

■ An "evidence of indebtedness" has been defined as a "contractual obligation to pay in the future for consideration presently received." *United States v. Austin*, 462 F.2d 724, 736 (10th Cir.), *cert. denied*, 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972). Applied as literally as LTV urges, this standard makes every option contract a "security," for an option is but an agreement to sell or buy something (commodity, security or foreign currency) in the future, at a fixed price, for consideration presently received or paid. It is well established, however, that a commodity futures contract or commodities contract for future delivery is not necessarily a security. *See supra;* 1 Bromberg & Lowenfels, *supra*, note 6, § 4.6 (414); *cf., Glazer v. National Commodity Research & Statistical Service, Inc.*, 547 F.2d 392, 393 (7th Cir. 1977) (rejecting SEC argument that options to buy or sell commodities futures are "evidence of indebtedness").

In *United States v. Jones*, 450 F.2d 523, 525 (5th Cir. 1971), the court held that the "term 'evidence of indebtedness' embraces only such documents as promissory notes which on their face establish a primary obligation to pay the holders thereof a sum of money." Because *Jones*, like *Austin*, construes 18 U.S.C. § 2311, its precedential authority as to Securities Act cases is uncertain. But *Jones* points to a logical distinction—that is, that the term "evidence of indebtedness" contemplates a payment of a sum of money in the future for consideration presently received, and not an exchange in the future of securities or commodities for a sum of money.[10] *See also*

9. It may be argued that the Standby Commitment is a "discretionary account," as discussed in *Moody*, because UMIC has the discretion to choose the coupon rate it will deliver. To the extent that UMIC has discretion, it is the discretion to determine the extent of *its* profits and *LTV's losses*. In reality, however, there is no real discretion because UMIC always delivers the available coupon rate giving *it* maximum profit.

10. Besides being inconsistent with *Jones*, a literal construction of *Austin* does not draw any distinction between commercial transactions and investment transactions. If *Austin* is correct that "*all* contractual obligations to pay in the future for consideration presently received" are "evidence of indebtedness," then all commercial notes are securities. *But see Williamson v. Tucker, supra*, at 426–29. Nor are the facts of *Austin* consistent with giving the opinion the broad reading LTV urges. There, the

*Barack v. United States*, 317 F.2d 619, 623 (9th Cir. 1963). A contrary holding "would be tantamount to a declaration that all bilateral executory contracts are securities under the federal securities laws." *Bergman v. Dean Witter & Co., Inc.*, 353 F.Supp. 669, 671 (C.D.Cal.1973) (rejecting proposition that futures contract for Japanese yen is "evidence of indebtedness").

■ That distinction is consistent with *SEC v. G. Weeks Securities, Inc.*, 483 F.Supp. 1239 (W.D.Tenn.1980), in which the court held that a "standby with pair-off," as operated, was "evidence of indebtedness."[11] There, no GNMA's were actually delivered—there was no exchange of bonds for money. The transaction in *Weeks* was a book transfer of GNMA's, with the only real risk to investors being the inability of the issuer to invest the commitment fees profitably enough to meet the "interest" payments. *See* note 11. But here, as in *Bache Halsey Stuart v. Affiliated Mortgage Investments, Inc.*, 445 F.Supp. 644 (N.D.Ga. 1977), there is no guaranteed profit for UMIC (or LTV). *See* 483 F.Supp. at 1244 n.6. In other words, the exchange of GNMA's for money contemplated by the Standby Commitment is not a financial vehicle for returning money loaned to or invested with the issuer (or, more correctly put, since LTV claims to be the investor, loaned to or invested with the investor)—it is not payment for the use of money. *See also SEC v. Commodity Options International, Inc.*, 553 F.2d 628 (9th Cir. 1977) (naked double option pure facade for investment). The Standby Commitment thus is not "evidence of indebtedness" within the meaning of the federal securities laws.

■ LTV contends that even if the Standby Commitment is not an "investment contract" or an "evidence of indebtedness," it should be considered a security because it is a "warrant or right to subscribe to or purchase" a security (GNMA's). 15 U.S.C. §§ 77b(1), 78c(a)(10). An obvious obstacle for LTV is that the Standby Commitment is not an option to "subscribe to or purchase" anything; at best, it is an option to sell. *See generally* 15 U.S.C. § 78c(a)(13), (14) (defining terms "buy," "purchase," "sale" and "sell"). But even assuming that the provision encompasses options to sell, it is inapplicable to the Standby Commitment.

■ As the Supreme Court noted in the context of the definitional category of "any . . . stock," a court must look beyond the label placed upon an instrument to the economic purpose of the instrument or transaction. *See United Housing Foundation, Inc. v. Forman, supra*, 421 U.S. at 848–51, 95 S.Ct. at 2058–60. A stock option can function as a "security" in two distinct senses. First, it can function as a "security" by its own operation. *See, e. g., Alvord v. Shearson Hayden Stone, Inc.*, 485 F.Supp. 848 (D.Conn.1980) (stock option "trading system" an "investment contract"); *SEC v. G. Weeks Securities, Inc., supra* (GNMA "standby with pair-off" a security); *cf., Moody v. Bache & Co., supra* (discretionary commodities account a security); *SEC v. Commodity Options International, Inc., supra* (naked double commodities option pure facade for "investment contract"). The Standby Commitment is not a "security" in that sense. *See supra*, at pp. 828–831.

defendant-issuer made a standby commitment *to guarantee a loan*, in return for which he received a commitment fee. There was no exchange of a security or commodity for money similar to the transaction here.

**11.** A "standby with pair-off" is a different transaction from a standby commitment. The investor in such a transaction pays a commitment fee for the right to buy a bond at a fixed price a certain number of days hence and, at his option, simultaneously sell it back at a higher fixed price (he instead may keep the bond and sell it on the market). The difference between these prices exceeds the commitment

fee by an amount referred to as "interest." The investor is "guaranteed" a profit (the "interest") with theoretical further upside potential. The issuer makes his money by investing the paid-in commitment fee between the time he receives it and the time the bond theoretically is delivered. But unless the issuer's investment efforts are successful, the investor does not receive his profit. The economic reality of the transaction is that the investor makes his money off the "interest." He, in effect, loans money to the issuer for a "guaranteed" return—a return dependent upon the issuer's skills.

The second sense in which a stock option can function as a "security" is as an interest in a common venture or enterprise through which an investor hopes to profit. With the typical stock option, the issuer sells an option in stock he has or will issue. Although the investor may not have an ownership interest until the option is exercised, he has paid money for the opportunity to profit from the "common enterprise" underlying the stock to be delivered. Thus, the typical stock option is merely another financial instrument for providing the investor with an interest in the same "common enterprise" underlying the stock. Accordingly, the typical stock option is a "security." *See Alvord v. Shearson Hayden Stone, Inc., supra,* at 851 n.3.

The Standby Commitment is not a "security" in that sense either. The agreement is not a common enterprise or venture between LTV and UMIC. Nor does UMIC, by exercising its option, create an interest by a investor (LTV) in a common venture organized by the issuer of the option (UMIC).

LTV argues that the Standby Commitment nevertheless is a "security" because the agreement represents an interest by it in the underlying GNMA's. That is, although the Standby Commitment does not function as a "common enterprise" between LTV and UMIC, it operates as a "common enterprise" between LTV and the original issuer of the GNMA's to be delivered. To the extent that the Standby Commitment can be considered a "security" in that sense, it is plain—even implicit to the argument—that the "common enterprise" underlying the "option-security" is the same "common enterprise" underlying the GNMA's to be delivered.[12] GNMA are securities, but as United States guaranteed securities, they are exempt from registration under the Securities Act. *See* 15 U.S.C. § 77c(a)(2); *Bache Halsey Stuart, Inc. v. Affiliated Mortgage Investments, Inc., supra.* Congress has determined that the common venture underlying GNMA's, presumably because of the guaranteed return, is sufficiently secure that registration is unnecessary. That determination is equally apposite to options to purchase or sell GNMA's. *See Bache Halsey Stuart, Inc. v. Affiliated Mortgage Investments, Inc., supra; cf.,* note 12, *supra* (option on commodity future contracts takes on character of contract underlying the option). Essentially, this court does not agree that an option to purchase or sell an exempt security, of itself, is sufficiently distinct from the underlying exempt security that the option falls outside the statutory exemption. The GNMA's thus are roughly analogous to commodities, with an option therein no more or less a security than the thing to be delivered. *See* note 12, *supra*; "Letter of SEC Chairman Roderick M. Hills, November 13, 1975, and CFTC staff response, publicly available December 3, 1975," *Fed.Sec.L.Rep.* (CCH) ¶ 80,336 at 85,-870 n.34 [1975–1976 transfer binder] (CFTC believes GNMA futures exempt from registration). In this regard, it is important to note that the purpose of the registration requirement is "to assure public access to material facts bearing on the value of the publicly traded security." *SEC v. Aaron,* 605 F.2d 612, 618 (2d Cir. 1979), *vacated on other grounds,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). But the value of the enterprise underlying a stock option is no more than the value of the enterprise underlying the security to be delivered. *Cf.,*

12. An analogous observation was made by the Ninth Circuit in *SEC v. Commodity Options International, Inc., supra,* in the context of commodity futures contracts. The court noted that although futures contracts are investments, they are not investments in an enterprise, but in the "underlying commodity." *Id.* at 632. The court then assumed, without deciding the question, "that a conventional option to buy or sell a futures contract takes on the character of the contract that is the option and is no more a security than is the underlying contract." *Id.*

The SEC apparently has taken a similar position with regard to contracts for delayed delivery of GNMA's. *See* Note, "The GNMA Securities Market: An Analysis of Proposals for a Regulatory Scheme," 9 *Fordham Urban L. J.* 457, 478 n.112 (1980); *but see* "Securities Trading Practices of Registered Investment Companies," 44 *Fed.Reg.* 25,128, 25,131 (April 27, 1979).

*Woods v. Homes and Structures of Pittsburgh, Kansas, Inc.*, 489 F.Supp. 1270, 1293–94 (D.Kan.1980) (guarantee attached to exempt municipal bond not treated differently from bond). LTV, of course, finds itself in the same position as had it made an identical standby agreement with an original issuer of GNMA's.[13]

Such a holding also is consistent with the design of the "warrant or right to subscribe to or purchase" provision of the statutory definition. The provision serves two related purposes. First, it prevents issuers from circumventing registration by using stock options to raise capital.[14] Second, it ensures that purchasers of stock options will have the same information as those who purchase the stock. Such is desirable, in that purchasers of options are subject to the same marketplace risks and corresponding need for information to which the registration and prospectus requirements of the Securities Act are directed. Neither purpose has any application where the security to be delivered itself is exempt from registration.[15]

■ In sum, from whatever definitional perspective the Standby Commitment is viewed, the economic reality remains unchanged. LTV did not enter into a common venture with UMIC, or rely on UMIC's financial expertise, or place any capital at risk with UMIC. The parties to the Standby Commitment did no more than make an option contract to deliver a thing, the value of which is under neither's control. Each took a position on the market in the hope that the market would turn to its advantage and the other's disadvantage. And even if the Standby Commitment is considered a "security" as a stock option in GNMA's, it is no more subject to registration than the underlying GNMA's. UMIC thus did not violate the Securities Act by failing to register the agreement.

*Registration Under the Exchange Act*

LTV contends that UMIC violated the Exchange Act by acting as a broker-dealer without registering as such. Alternatively, LTV argues that UMIC is an unregistered "exchange."

Section 15 of the Exchange Act provides in pertinent part:

It shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of any security (*other than an exempted security . . .*) unless such broker or dealer is registered in action with subsection (b) of this section.

15 U.S.C. § 78*o*(a)(1) (emphasis added).

■ As noted, the Standby Commitment is not a "security" within the meaning of the Securities Act. There being no functional difference between the definitions of the Securities Act and the Exchange Act, *see Tcherepnin v. Knight, supra*, the Standby Commitment also is not a "security," as

13. LTV implies that the registration requirements of § 5 are necessary to protect investors from fraudulent practices by the issuers of such options. But, as discussed *infra*, the registration exemption does not affect the applicability of Rule 10b–5.

14. For example, a corporation could sell options to shares it does not intend to issue for several years. Unless such options are securities, the corporation will have avoided registration, at least until the options are exercised.

15. This court expresses no opinion as to the applicability of its analysis to the type of GNMA futures traded on the Chicago Board of Trade. *See*, Note, "The GNMA Securities Market: An Analysis of the Proposals for a Regulatory Scheme," *supra*, at 463–67; Guttman,

"The Futures Trading Act of 1978: The Reaffirmation of CFTC–SEC Coordinated Jurisdiction Over Security/Commodities," 11 *Am.U.L.Rev.* 1, 23 n.130 (1978); *Bache Halsey Stuart v. Affiliated Mortgage Investments, Inc., supra*, at 646.

LTV has made no claim concerning the legality of the Standby Commitment under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, and this court expresses no opinion as to the applicability of the Act. *See SEC v. G. Weeks Securities, Inc., supra*, at 1244–46. Nor does this court express any opinion as to the possible preemptive force of the Commodity Exchange Act with regard to LTV's claims under Rule 10b–5, the Texas Blue Sky Act, and the Tennessee gaming statutes. *See infra.*

defined by the Exchange Act. In this regard, the Exchange Act classifies United States guaranteed securities as "exempted securities." 15 U.S.C. § 78c(a)(12). Because the Standby Commitment is not a "security," UMIC did not violate the Exchange Act by making use of the mails to "sell" the Standby Commitment without registering as a broker or dealer.

Section 5 of the Exchange Act provides in pertinent part:

It shall be unlawful for any broker, dealer, or exchange, directly or indirectly, to make use of the mails . . . for the purpose of using any facility of an exchange . . . to effect any transaction in a security . . . unless such exchange . . . is registered as a national securities exchange. . . .

15 U.S.C. § 78e.

An "exchange" is defined as:

any organization, association, or group of persons . . . which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood. . . .

15 U.S.C. § 78c(a)(1).

LTV contends that UMIC is an unregistered "exchange," and, by using its own facilities, violated the Exchange Act. UMIC responds that if it is an "exchange," then virtually every stock broker or dealer in the country is in technical violation of the Exchange Act.

■■■ This court does not agree that UMIC operates as an "exchange." UMIC does not use its facilities or otherwise provide a marketplace for bringing together purchasers and sellers of securities. Nor does UMIC perform the functions commonly performed by a stock exchange.

The gist of LTV's argument is that UMIC is an "exchange" because it sometimes matches sales with purchases. That is, a customer of UMIC will inform UMIC that he is interested in purchasing certain securities. If UMIC does not have the securities on hand, it may seek out a seller from whom it can purchase the securities for resale. Conversely, when a potential seller offers to sell his securities, UMIC may first determine whether it has a purchaser before it buys the securities for resale. During a typical day or week, many such requests to buy or sell may be communicated to UMIC, which can then match offers to sell with offers to buy. This, LTV contends, constitutes the operation of an "exchange."

But the fact of the matter is that UMIC purchases and sells securities for its own account, albeit for eventual resale. As with any merchant of any commodity, it may choose not to make purchases until it has lined up customers, or make sales until it has found a source of supply. But that does not mean that UMIC is a marketplace or an exchange. Neither UMIC nor its salesmen—the "brokers" in LTV's scenario—are agents of those who purchase their securities from or sell their securities to UMIC; nor does UMIC owe its customers the fiduciary duties associated with an agent. UMIC buys securities as cheaply as it can, and sells them at the highest possible price, making its profit off the difference.

An "exchange" is a place where or means through which buyers and sellers, or their respective agents, meet to negotiate and consummate purchases. Although a merchant (or dealer) may serve the same ultimate economic purpose by facilitating the efficient reallocation of whatever is sold, there is a fundamental distinction. An "exchange" functions on the principle that if potential buyers and sellers can meet to exchange information, they may find a mutually acceptable sales price. A merchant, to the extent that he operates as an arbitrageur, survives only as long as his profit (the difference between the purchase price and the sales price) is less than the cost to potential buyers and sellers of exchanging the information necessary for a direct sale. Thus, an "exchange" functions by facilitating the direct transfer of information between seller and buyer; while a merchant

functions by his ability to effect the same reallocation without any direct transfer of information between seller and buyer.

This court finds that UMIC is neither an unregistered broker-dealer nor an unregistered exchange within the meaning of the Exchange Act.

### Registration Under the Texas Blue Sky Act

LTV contends that UMIC violated the Texas Blue Sky Act, *Tex.Rev.Civ.Stat.Ann.* art. 581–1 *et seq.*, by failing to register the Standby Commitment and failing to register as a dealer.

Article 581–5 of the Act provides:

Except as hereinafter in this Act specifically provided, the provisions of this Act shall not apply to the sale of any security when made in any of the following transactions and made any of the following conditions, and the company or person engaged therein shall not be deemed a dealer within the meaning of the Act; that is to say, the provisions of this Act shall not apply to any sale, offer for sale, solicitation, subscription, dealing in or delivery of any security under any of the following transactions or conditions:

\* \* \* \* \* \*

H. The sale of any security to any . . . savings institution. . . .

Rule 065.05.00.008, 7 *Tex.Admin.Code* § 109.3 (effective May 17, 1976, 1 *Tex.Reg.* 1181), promulgated by the State Securities Board pursuant to its authority under Article 581–28–1, provides:

The term "savings institution" as used in [Article 581–5(H)] of the [Texas Blue Sky Act], includes any federally chartered credit union or savings and loan association and any credit union or savings and loan association chartered under the laws of any state of the United States.

■ In that the Texas Blue Sky Act exempts the sale of any security to any federal credit union,[16] it is inapplicable to the Standby Commitment.[17]

### The Alleged Fraudulent Practices

■ LTV alleges that UMIC violated the anti-fraud provisions of the Exchange Act by (a) knowingly misrepresenting to LTV that the GNMA's would not be delivered, and (b) knowingly failing to disclose the fact that UMIC had entered into a standby commitment with Banco. Although the Standby Commitment is not a "security" within the meaning of the Exchange Act, the GNMA's which UMIC attempted to deliver clearly are, albeit "exempted securities." 15 U.S.C. § 78c(a)(12). Exempted securities are subject to the anti-fraud provisions of the federal securities laws, and, specifically, to Rule 10b–5. *See Teamsters v. Daniel, supra,* 439 U.S. at 564 n.18, 99 S.Ct. at 799 n.18; *Kubik v. Goldfield,* 479 F.2d 472, 477 (3d Cir. 1973); *In re New York City Municipal Securities Litigation,* 507 F.Supp. 169, 174–75 (S.D.N.Y. 1980).

LTV adduced no evidence at trial of any affirmative misrepresentation by UMIC regarding the possibility of delivery of the

---

**16.** Citing *Breeding v. Anderson,* 152 Tex. 92, 254 S.W.2d 377 (1953) and *Rowland Corp. v. Integrated Systems Technology, Inc.,* 488 S.W.2d 133 (Tex.Civ.App.—Waco 1972, *writ ref'd* n.r.e.), LTV argues that UMIC nevertheless is in violation of the Act for dealing in unregistered securities because the Standby Commitment is not an "exempt security," as defined by Article 581–6. Neither case is apposite. In *Breeding,* the Court read certain transaction exemptions as being applicable only to transactions by identified individuals, and not to transactions by dealers acting on behalf of those individuals. 254 S.W.2d at 379. Such is not at issue here. Whatever the correctness of

*Rowland, see* Lebowitz, "Recent Developments in Texas Corporation Law," 28 *Sw.L.J.* 823, 861–873 (1974) (*Rowland* "wrong in terms of grammar, structure, history and policy"), the court's analysis hinges on the effect of the word "nor" in Article 581–34, a matter of no relevance to this case. Moreover, *Rowland* was overruled by amendment of the Article in 1975.

**17.** Although the anti-fraud provisions of the Act are applicable to exempt transactions, *see* Article 581–33(A)(2), LTV makes no claim thereunder.

GNMA's pursuant to the Standby Commitment. There is no evidentiary foundation for the allegation that UMIC represented that the GNMA's would not be delivered, were not intended to be delivered, or were not normally delivered in the ordinary course of business.

 Moreover, even had LTV been able to prove such a misrepresentation, it would not have met its burden of showing justifiable reliance. *See DuPuy v. DuPuy*, 551 F.2d 1005 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). The structure of the Standby Commitment assumes that UMIC will deliver the GNMA's if it is profitable for it to do so, and will not tender them if such is unprofitable. LTV's contention that UMIC represented that it would not deliver the GNMA's begs the unanswered question of why UMIC paid LTV $200,000 in the first place. LTV asks this court to find that UMIC effectively promised LTV a gift of $200,000, and that UMIC was justified in relying on that promise. There is no evidence to support the former proposition, and no logic to the latter.

LTV also asserts that UMIC fraudulently failed to disclose the standby commitment with Banco. As best this court can determine, LTV's argument appears to be that had it known of UMIC's standby commitment with Banco, it would have realized that UMIC would have to deliver the GNMA's to LTV if Banco delivered the GNMA's to UMIC. LTV thus seems to argue that UMIC's standby commitment with Banco increased the possibility of UMIC tendering the GNMA's to LTV under the UMIC–LTV Standby Commitment, and that LTV, therefore, was prejudiced by UMIC's failure to disclose Banco's role.

 As with an affirmative misrepresentation case, materiality and justifiable reliance are elements of a Rule 10b–5 omissions case. Because of the difficulty of proving reliance in an omissions case, reliance may be presumed where the plaintiff "could justifiably expect that the defendants would disclose material information." *Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir. 1981) (*en banc*). But whether or not LTV's reliance is presumed, the Banco-UMIC standby commitment was not material information.

LTV's argument is bottomed on the assumption that UMIC will only deliver the GNMA's to LTV if Banco delivers the GNMA's to UMIC. The assumption is made in total disregard of the market in GNMA's. If, during the period of the Standby Commitment, the market in GNMA's declines (as it actually did), then UMIC will deliver the GNMA's to LTV whether or not Banco delivers the GNMA's to it. UMIC will do so because it can purchase the GNMA's on the open market for less than LTV is obligated to pay. To assume that UMIC will forgo that opportunity, is to assume it will forgo profit it paid $200,000 for the chance to make.[18]

If, however, during the period of the Standby Commitment, the market in GNMA's improves, then UMIC will not deliver the GNMA's to LTV whether or not Banco delivers the GNMA's to it. UMIC will not do so because it can sell the GNMA's on the open market for more than LTV is obligated to pay. To assume that UMIC nevertheless will deliver the GNMA's to LTV, is to assume that UMIC will take an unnecessary loss.[19]

Simply put, UMIC's decision to deliver the GNMA's is solely a function of whether delivery is profitable (that is, whether LTV will have to pay more or less than the prevailing fair market value of the GNMA's). The source of the GNMA's—

---

18. Since LTV allegedly did not know of the Banco-UMIC standby commitment at the time it executed the Standby Commitment with UMIC, LTV presumably believed that UMIC would purchase the GNMA's on the market if it became profitable for UMIC to do so. *See supra.* That UMIC obtained the GNMA's from Banco rather than on the market is irrelevant to whether it is profitable for UMIC to make delivery.

19. Of course, were UMIC to deliver the GNMA's, LTV would profit beyond the $200,000 commitment fee by selling the GNMA's on the market for more than it paid UMIC.

Banco or the open market—is a completely irrelevant consideration. Because the Banco-UMIC standby commitment has no bearing on whether UMIC will exercise its option to deliver the GNMA's to LTV, it is not information which a reasonable man would have attached importance to in deciding whether to execute the Standby Commitment. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 543 (5th Cir. 1981) (test of materiality is "whether a reasonable man would attach importance to the fact misrepresented [or omitted] in determining his course of conduct.") UMIC thus did not fail to disclose material information by not disclosing the Banco-UMIC standby commitment.[20]

## The Tennessee Gaming Statutes

■ LTV contends that the Standby Commitment is in violation of three Tennessee gaming statutes, *Tenn.Code Ann.* §§ 39–2020 (prohibiting futures contracts made without contemplation of actual delivery), 39–2021 (prohibiting futures contracts limiting profits), and 39–2023 (prohibiting "Bucket Shops").[21] As to each statute, the burden of proving that the accused transaction constitutes a gaming contract rests upon the party making the assertion. *See Palmer v. Love*, 18 Tenn.App. 579, 80 S.W.2d 100, 105 (1935); *Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Schriver*, 541 S.W.2d 799, 804 (Tenn.App.), *cert. denied*, (Tenn.1976) ("*Merrill Lynch*").

Section 39–2020 provides:

> Any sale, contract, or agreement for the sale of bonds, stock, grain, cotton, or other produce, property, commodity, article or thing, for future delivery, where

either of the contracting parties, buyer or seller, is dealing simply for the margin, or on the prospective rise or fall in the price of the article or thing sold, *and where either of the said contracting parties has no intention or purpose of making actual delivery or receiving the property or thing in specie*, shall be deemed and declared gaming. (emphasis added).

*See also* § 39–2022 (violation of § 39–2020 punishable by fine or imprisonment).

■ To establish a violation of § 39–2020, LTV must prove that at time of the execution of the Standby Commitment *either* it had no intention of taking delivery of the GNMA's *or* UMIC had no intention of delivering the GNMA's. LTV has not met its burden.

There is no evidence that UMIC did not intend to deliver the GNMA's, provided it was in UMIC's interest to exercise its option. LTV's assertion that UMIC did not intend to deliver the bonds is without factual foundation.

There also is no evidence that LTV, when it executed the Standby Commitment, intended not to take delivery of the GNMA's. Indeed, there was no competent evidence of LTV's intention at the time it entered into the Standby Commitment.[22] But the evidence does show that for over a year preceding the breach, LTV's Board of Directors reviewed its alternatives (whether to take delivery or breach the agreement), and, in particular, whether LTV was sufficiently liquid to pay for the GNMA's. This court finds that LTV has failed to prove that it did not intend to take delivery of the GNMA's.[23]

**20.** LTV also claims, without providing any explanation, that UMIC violated 17 C.F.R. § 240.-15cl–6. Presumably, LTV's theory is that UMIC violated the rule by failing to disclose the Banco-UMIC standby commitment. The regulation is inapposite because UMIC is neither a "broker" nor a "dealer who receives or has promise of receiving a fee." Moreover, even if the rule were applicable, this court does not construe the rule to require the disclosure of the Banco-UMIC standby commitment.

**21.** Sections 39–2020 and 39–2021 were enacted in 1883. Section 39–2023 was enacted in 1909,

and amended in 1919. All three statutes were carried over into the 1932 Code.

**22.** "The intention that governs the validity of the transaction is that which exists at the time of entering into the contract." *Palmer v. Love*, *supra*, at 102, 104. *See also* 14 *Williston on Contracts* § 1674 (3d ed. 1972); *Restatement of Contracts* § 523(1) (1932).

**23.** UMIC correctly notes that if LTV harbored an undisclosed intent not to perform, it would be attempting to void the contract on the basis of its own fraudulent purpose. *See Palmer v.*

Section 39–2021 provides in pertinent part:

Any sale of any property or thing, or any contract or agreement for such sale, for future delivery, whereby the purchaser is, by the contract or agreement, inhibited from ... making, realizing, or receiving more than a certain stipulated gain or profit by said sale or purchase, shall be deemed void, and the same is declared gaming.

See also § 39–2022 (violation of § 39–2021 punishable by fine or imprisonment).

In the nearly one hundred years since its enactment, see note 21, supra, it does not appear that the statute has been directly applied or construed in any reported decision.

LTV argues that the Standby Commitment violates § 39–2021 because it inhibits LTV from making more than $200,000 profit. That is, LTV contends that unless UMIC chooses to deliver the GNMA's when it would be unprofitable for UMIC to do so, the Standby Commitment is unenforceable because LTV can realize no more than $200,000 under the agreement.

If LTV's interpretation of § 39–2021 is correct, every option contract governed by Tennessee law is void. An option contract, by its very nature, requires that one party stand by while another party decides whether to exercise the option. See pp. 830–831, supra. The party that stands by does so for a fee. If the option is never exercised, that fee represents the profit realized by the party standing by. Assuming the party with the option exercises the option only when such is in its economic interest, the party that stands by is limited to a profit of no more than the fee paid for the option. LTV's position thus amounts to

a contention that after nearly one hundred years of oblivion, this statute should be construed to void every option contract governed by Tennessee law.[24]

In *Palmer v. Love, supra*, the Tennessee Supreme Court held that option contracts, including "put" options, are not per se gaming transactions. *Id.*, 18 Tenn.App. 579, 80 S.W.2d at 106. That holding cannot be squared with LTV's construction of § 39–2021. *See also* 14 *Williston on Contracts* §§ 1669, 1669A (3d ed. 1972) (contract giving one party option to sell securities is not wager); 6A *Corbin on Contracts* § 1497 (1951) (same).

 This court reads the cited portion of § 39–2021 as a codification of the common law rule that once a delivery price is fixed by the parties, and delivery made, any later settlement reflecting price fluctuations is gaming. As stated by the Alabama Supreme Court, "where the contract fixes a definite price to be paid, in any event, for the transfer of the title, and delivery is then made, and the contract stipulates for an additional settlement based upon the fluctuation of the market thereafter, the stipulation for additional settlement is wager, pure and simple." *South Carolina Cotton Growers' Co-op Ass'n v. Weil*, 220 Ala. 568, 126 So. 637, 642 (1930); *see also Burney v. Blanks*, 136 S.W. 806, 809 (Tex.Civ.App.1911, *writ refused*). Section 39–2021 thus prohibits contracts for future delivery in which the buyer agrees to reimburse the seller for any increases in the market price of the delivered security or commodity after delivery. Such a transaction is not at issue here.[25] To give § 39–2021 the broader construction LTV urges would be contrary to well settled Tennessee

Love, *supra*, 18 Tenn.App. 579, 80 S.W.2d at 102.

24. In that § 39–2021, unlike § 39–2023, is not subject to the savings provisions of § 39–2028, it would not matter whether the option contract was made through the facilities of a legitimate exchange.

25. UMIC notes that even if the statute were applicable, LTV was not inhibited from making

more than a stipulated profit because it had the $200,000 commitment fee to invest during the period of the Standby Commitment. UMIC also notes that if the market in GNMA's had improved after UMIC gave notice of its intention to deliver, but before the settlement date, LTV could have received the GNMA's at a price less than the prevailing market value at the time of actual delivery.

case law that option contracts are not per se gaming transactions.[26]

LTV contends that UMIC is a "Bucket Shop." A "Bucket Shop" is defined as: an office, store, or other place wherein the proprietor or keeper thereof, or other person or agent either in his or its behalf, or as an agent or correspondent of any other person, within or without the state, conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any stocks, grains, provisions, or other commodity or personal property wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades, or transactions shall be or may be closed, adjusted, or settled according to or on the basis of the market quotations or price made on any board of trade or exchange upon which the commodities or securities referred to in such contracts, agreements, trades, or transactions are dealt in and without a bona fide transaction on such board of trade or exchange, and the maintenance of any such office, store, or other place of business, and the making of such contracts or agreements shall be and the same are declared illegal and unlawful.

Section 39–2023. Persons guilty of operating a "Bucket Shop" are punishable by fine or imprisonment. See § 39–2029.

■ Section 39–2023 establishes a twofold test for determining the illegality of a transaction: (1) both parties to the contract must have intended to settle on the margin (2) without effecting a bona fide buy and sell transaction on a board of trade or exchange. See Paine, Webber, supra, note 26, at 424–27; accord, Merrill Lynch, supra, at 802. It is not necessary to show that the parties did not intend to receive or deliver the commodity. See Paine, Webber, at 424; Merrill Lynch, at 802.

■ LTV has not proved that it and UMIC intended to settle on the margin. Specifically, LTV has not persuaded this court that the parties to the Standby Commitment intended that the agreement would be settled on the difference between the contract price and the fair market value at the time of delivery.[27] LTV thus has failed to show that UMIC is a "Bucket Shop."

In sum, LTV has adduced no evidence supporting its claim that the Standby Commitment is in violation of Tennessee gaming statutes.

### III.

This court finds that UMIC is entitled to its damages from LTV's nonperformance under the Standby Commitment. The parties disagree on the proper measure of those damages.

UMIC contends that it is entitled to the benefit-of-the-bargain, that being the difference between what LTV is obligated to pay and the fair market value of the GNMA's on the settlement date (July 22, 1980). Under the yield maintenance clause, UMIC is entitled to deliver the GNMA's bearing the most profitable coupon rate. That coupon rate is 12.5%. GNMA's bear-

---

**26.** It has been held that the validity of futures contracts is found in § 39–2023, and not in § 39–2020. See Paine, Webber, Jackson & Curtis, Inc. v. Lambert, 389 F.Supp. 417, 429 (E.D. Tenn.1975), affirmed, 6 Cir., 524 F.2d 1405, 1406 ("Paine, Webber"). If that is correct, then, by implication, such also would be true of the interrelationship of § 39–2023 and § 39–2021.

**27.** LTV appears to suggest that the margin maintenance clause should be construed as evidence that the parties intended to settle on the margin. Such an inference is impermissible. See Merriman & Millard Co. v. Cole, 198 S.W. 1054, 1056 (Tex.Civ.App.—Ft. Worth 1917, writ dismissed). As observed in Merriman, margin may serve as security for nonperformance. It has been observed that a margin requirement will "reduce the prospect that the parties to the contract would not be able to make good delivery on the settlement date." Note, "The GNMA Securities Market: An Analysis of Proposals for a Regulatory Scheme," supra, at 472 n.83. In this regard, it is difficult to reconcile LTV's contention (made here and in the context of its 10b–5 claims) that it did not expect to have to take delivery of the GNMA's with the fact that it met a $500,000 margin call in 1979. See supra, at pp. 824–825.

ing a 12.5% coupon rate had a fair market of $101.87 per security on July 22, 1980, giving a total fair market value of $4,075,-000 for the GNMA's to be delivered by UMIC. LTV is obligated to pay $5,221,250 ($130.53125 per security) for those GNMA's, that being the price producing the same yield as provided for in the Standby Commitment. UMIC's benefit-of-the-bargain thus is $1,146,250.

LTV contends that UMIC is entitled to no damages, never having taken delivery of the GNMA's tendered by Banco pursuant to the Banco-UMIC standby commitment. LTV argues that since UMIC never took delivery of the GNMA's, Banco and UMIC instead having settled their claims, UMIC suffered no damages as a consequence of LTV's breach. Alternatively, LTV argues that there is no benefit-of-the-bargain which UMIC can recover. Had LTV taken delivery of the GNMA's tendered by UMIC, UMIC presumably would have taken delivery of the GNMA's tendered by Banco. The two transactions would have covered each other, leaving UMIC with no profit beyond the $40,000 difference in commitment fees already paid.

Should this court find that UMIC is entitled to the difference between what LTV is obligated to pay and the fair market value of the GNMA's to be delivered, LTV contends that the damages should be measured using the coupon rate most favorable to it and the fair market value prevailing on the date LTV communicated its intent to breach (June 17, 1980). Using the coupon rate most favorable to LTV—8.5%—UMIC's damages, measured as of July 22, 1980, are

$638,750 (market price of $85.03125; contract price of $101). If the fair market value prevailing on June 17, 1980, is used, UMIC's damages are $933,750 (market price of $107.1875; contract price of $130.53125) for 12.5% GNMA's, and $410,000 (market price of $90.75; contract price of $101) for 8.5% GNMA's. It is stipulated that both 8.5% and 12.5% GNMA's were available on the market on June 17, 1980, and July 22, 1980.

▮▮▮ The measure of damages is determined by Tennessee law, and, specifically, Article 8 (Investment Securities) of the Tennessee Uniform Commercial Code ("UCC").[28] Tenn.Code Ann. §§ 47–8–101 et seq. GNMA's are "investment securities" within the meaning of § 47–8–102(1) of the UCC. See In re Legel, Braswell Gov't Sec. Corp., 648 F.2d 321 (5th Cir. 1981); First Nat'l Bank of Chicago v. Jefferson Mtg. Co., 576 F.2d 479, 485 (3d Cir. 1978). In that LTV has signed a writing indicating "that a contract has been made for sale of a stated quantity of [GNMA's] at a defined or stated price," the Standby Commitment is enforceable. See § 47–8–319(a), (d).[29]

▮▮▮ Section 47–8–107 provides that a seller of securities may recover the price against a nonperforming buyer for those securities accepted by the buyer and for other securities if their resale would be unduly burdensome or if there is no readily available market for their resale. Because LTV has not accepted any of the GNMA's, and there is no suggestion that resale of GNMA's is unduly burdensome or that there is no readily available market, the

---

**28.** The Standby Commitment contains a liability clause that provides:

As a purchaser from us under mandatory delivery provisions or upon timely notification of intent to deliver securities under optional delivery, you shall be liable to us for any and all losses and reasonable attorneys' fees caused us by reason of any failure by you to accept the Securities in accordance with our agreement, including, without limitation, reimbursement of expenses incurred by us in connection with our agreement, loss of profit to us respecting resale of the Securities agreed to be purchased and resale thereof to our customers at prices designed to give

such customers a yield which such customers would have received had the Securities been sold by us to such customers in accordance with agreements between them and us.

Because UMIC did not resell the GNMA's tendered to LTV, the portion of the clause pertaining to resale is inapplicable. The clause by its own terms does not preclude UMIC from pursuing other relief.

**29.** The yield maintenance clause does not make the price indefinite within the contemplation of § 47–8–319. See First Nat'l Bank of Chicago v. Jefferson Mtg. Co., supra, at 485.

section is inapplicable. Although "investment securities" are expressly excluded from the coverage of Article 2 (Sales) of the UCC, Article 2 may be applied to a situation involving "investment securities" not covered by Article 8 where such application is sensible. *See* "Comments To Official Text," § 47–2–105; *cf., Lindsey v. Stein Brothers & Boyce, Inc.,* 222 Tenn. 149, 433 S.W.2d 669, 671–72 (1968). Courts have held that Article 2 remedies are applicable to sales of "investment securities." *See First Nat'l Bank of Chicago v. Jefferson Mtg. Co., supra; G. A. Thompson & Co. v. Wendell J. Miller Mortgage Co., Inc.,* 457 F.Supp. 996 (S.D.N.Y.1978); *cf. Bache & Co., Inc. v. International Controls Corp.,* 339 F.Supp. 341, 349–50 (S.D.N.Y.1972), *aff'd,* 469 F.2d 696 (2d Cir. 1972).

■ Under Article 2, where a buyer wrongfully repudiates a contract for delivery of goods, the seller is entitled to the difference between the market price at the time and place for tender and the unpaid contract price. *See* §§ 47–2–610, 47–2–703, 47–2–708. Application of that remedy to this case appearing sensible, this court finds that UMIC is entitled to the difference between the fair market value of the GNMA's on the settlement date (July 22, 1980) and the unpaid contract price.

Citing *Stewart v. Cran-Vela Rental Co., Inc.,* 510 F.2d 982 (5th Cir. 1975), LTV contends that the coupon rate most favorable to it should be used in measuring UMIC's damages. *See also* 11 *Williston on Contracts* § 1407 (3d ed. 1968); *Restatement of Contracts* § 344 (1932). *Stewart* is inapposite, in that there, unlike here, the option of fulfilling one of two alternative promises rested with the breaching party. LTV's argument amounts to a contention that by breaching the agreement before UMIC delivered the GNMA's, LTV preempted

UMIC's right to deliver the GNMA's most profitable to UMIC, and, accordingly, most expensive to LTV. Were this court to adopt LTV's reasoning, it would be an open invitation to others similarly situated to repudiate their obligation and thereby minimize their losses. UMIC paid for the right to deliver the GNMA's bearing the coupon rate most profitable to it, and LTV cannot deprive UMIC of that right by refusing to take delivery.[30]

■ Whatever the merits of LTV's legal arguments concerning alternative promises, this court finds that UMIC gave notice that it would deliver 12.5% GNMA's prior to LTV's repudiation. *See* 11 *Williston on Contracts* § 1407 (3d ed. 1968) (once alternative has been chosen, damages are measured by the value of that alternative); *Restatement of Contracts* § 344, comment a (1932) (same). In its letter of March 24, 1980, UMIC gave notice of its intention to deliver the GNMA's pursuant to the Standby Commitment. Although it did not expressly state that it would deliver 12.5% GNMA's, it used such GNMA's in computing LTV's margin obligations. In its letter of May 21, 1980, responding to LTV's request for clarification, UMIC reiterated its right to deliver GNMA's bearing a coupon rate other than 8.5%. Again, in computing LTV's margin obligations, UMIC used 12.5% GNMA's. This court finds that the letters created an inescapable inference that UMIC would deliver 12.5% GNMA's, and that LTV thus was put on notice of UMIC's intention to deliver 12.5% GNMA's. The appropriate coupon rate for measuring UMIC's damages, therefore, is 12.5%.

This court is not persuaded that because UMIC failed to take delivery of the GNMA's tendered by Banco, it did not suffer any damages as a result of LTV's breach. Certainly, had Banco not tendered

30. There has been some suggestion by LTV that the yield maintenance clause should not be read to permit the delivery of GNMA's bearing any available coupon rate. UMIC adduced evidence showing that its construction is consistent with both industry practice and its understanding at the time of executing the Standby Commitment. There also was evidence that yield maintenance clauses are bargained for provisions in standby commitments. LTV has entered into other standby commitments, some with and some without a yield maintenance clause. No evidence was adduced that LTV did not understand the operation of the yield maintenance clause at the time it executed the Standby Commitment.

the GNMA's, or UMIC otherwise been relieved of its obligation to take delivery, UMIC would be entitled to the benefit-of-the-bargain of the Standby Commitment. LTV's argument that UMIC suffered no damages thus is predicated on its claim that UMIC was relieved of its obligation to take delivery under the Banco-UMIC standby commitment *as a consequence* of LTV's nonperformance.[31] The evidence, however, does not support the claim.

It is undisputed that UMIC's decision not to take delivery of the GNMA's tendered by Banco was caused by LTV's repudiation of the Standby Commitment. But that does not mean that UMIC escaped its legal obligation to take delivery or that it did not face substantial liability. In fact, although this court makes no ruling on the merits of the claim, it appears that UMIC's contention that Banco had failed to provide written notice of its intention to deliver may have been pretextual,[32] and made to avoid insolvency.[33] UMIC thus did not avoid any cost or expense as a consequence of LTV's failure to perform.

The fact that UMIC and Banco settled their claims through a partial assignment of UMIC's interest in this litigation does not alter that conclusion. Indeed, the settlement is a recognition of UMIC's liability. To find, as LTV urges, that UMIC has suffered no damages because UMIC will pay Banco nothing if this court finds that UMIC has suffered no damages, would be a triumph of circular reasoning.[34]

For the stated reasons, UMIC is entitled to recover its damages of $1,146,250.

## IV.

 UMIC requests pre-judgment interest as of July 22, 1980, at the rate of 10% per annum. Under Tennessee law, an award of pre-judgment interest is in the trial court's equitable discretion. *See Tyber v. Great Central Ins. Co.*, 572 F.2d 562, 564 (6th Cir. 1978); *Farmers Chemical Ass'n, Inc. v. Maryland Casualty Co.*, 421 F.2d 319, 322–23 (6th Cir. 1970).[35] LTV's breach of

---

**31.** *Tenn.Code Ann.* § 47–2–708 provides that a seller is entitled to the difference between the market price and the contract price, *less expenses saved in consequence of the buyer's breach. See also Restatement (Second) of Contracts* § 361 (tent. draft no. 14, 1979) (injured party entitled to loss in value less cost or other loss avoided by not having to perform).

**32.** Banco apparently gave written notice by letter of June 12, 1980. Whether UMIC received the letter is unclear.

**33.** In its letters of March 24, 1980, and May 21, 1980, UMIC informed LTV that it would most probably be unable to continue business if it had to purchase the GNMA's and LTV dishonored the Standby Commitment.

**34.** Banco tendered 10% GNMA's, having purchased *those from UMIC for the purpose of* delivery pursuant to its standby commitment with UMIC. The difference in the fair market value of those GNMA's (as measured on July 22, 1981) and the contract price was $836,875. The Chief Executive Officer ("CEO") of UMIC testified that it is UMIC's policy always to deliver the GNMA's bearing the coupon rate giving it maximum profit; *in this case,* 12.5%. Thus, even if UMIC avoided an expense as a consequence of LTV's breach, the expense was no more than the $836,875 it would have lost by accepting delivery of the Banco GNMA's. As noted, the difference in the fair market value of the 12.5% GNMA's tendered by UMIC and LTV's contract price was $1,146,250. *See* pp. 839–840, *supra.* Viewing the Banco-UMIC and UMIC-LTV standby commitments as "paired," UMIC's profit from taking the 10% GNMA's and delivering the 12.5% GNMA's would have been $309,375. Taking this "paired" view, LTV's nonperformance deprived UMIC of a profit of $309,375 and exposed UMIC to an uncovered liability (loss) of $836,-875.

Despite LTV's assertion that UMIC would have delivered the 10% (Banco) GNMA's had LTV performed, it adduced no evidence to that effect. LTV asserts that UMIC would have passed through the 10% GNMA's because those were the GNMA's it would have had on hand at the time of delivery. But, as noted, UMIC's CEO testified that where UMIC has the option, it delivers securities bearing the most profitable coupon rate to UMIC, and that it intended to deliver such GNMA's to LTV whether or not Banco elected to deliver any GNMA's to it. The parties have stipulated that 12.5% GNMA's were available on July 22, 1980, and UMIC's CEO testified that UMIC easily could have purchased the GNMA's on margin for immediate resale to LTV.

**35.** *Tenn.Code Ann.* § 47–14–123 provides:

Pre-judgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws

the Standby Commitment was intentional, and made with full knowledge that performance would result in a substantial loss. Since July 22, 1980, LTV has had the opportunity to invest the $1,146,250 and the original commitment fee of $200,000 at interest rates well above 10% per annum. Under the circumstances, this court finds pre-judgment interest proper, and awards interest as of July 22, 1980, at the rate of 10% per annum.[36]

## V.

Under the Standby Commitment, UMIC is entitled to its reasonable attorneys' fees. *See* note 28, *supra.* The amount of those fees has been left open for later determination. Within fifteen days of the entry of this Opinion, UMIC's attorneys are to file an affidavit setting forth their reasonable fees incurred in this action. The affidavit is to be accompanied by copies of relevant time records and expense vouchers. Any attorneys' fees incurred with regard to Banco's intervention for which UMIC seeks reimbursement are to be segregated. UMIC also is to submit a brief on the appropriate standard for determining reasonable attorneys' fees, as well as the basis for recovery of fees incurred with regard to Banco's intervention.[37]

This court is uncertain as to whether Banco is seeking its reasonable attorneys' fees and court costs. If Banco is seeking its fees and costs, it is to file an appropriate affidavit and brief within fifteen days.

LTV will have fifteen days thereafter to respond. An evidentiary hearing will be scheduled after this court has reviewed the affidavits and briefs. The parties are encouraged to resolve the issue of reasonable attorneys' fees by stipulation.[38]

of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum.... (effective May 1, 1979).

As of April 1, 1979, pre-judgment interest was a matter of right for liquidated and settled claims. *Tenn.Code Ann.* § 47–14–107. Where an award was not a matter of right, pre-judgment interest was in the equitable discretion of the court. *See Farmers Chemical Ass'n, Inc. v. Maryland Casualty Co., supra.* In that § 47–14–107 was rescinded on April 30, 1979, and § 47–14–123 provides that prejudgment *may* be awarded, it is unclear whether there presently is any entitlement to pre-judgment interest as a matter of right. Because UMIC does not request pre-judgment interest as a matter of right, this court expresses no opinion on whether its claim was liquidated and settled on July 22, 1980. Similarly, since UMIC seeks no more than the 10% maximum rate, this court expresses no opinion on whether the statutory

limitation applies to transactions entered into prior to May 1, 1979.

**36.** Unless the parties can persuade this court that *Tenn.Code Ann.* § 47–14–121 is inapplicable, post-judgment interest will be set at 8% per annum. *See* 28 U.S.C. § 1961.

**37.** *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974); *see also Copper Liquor, Inc. v. Adolph Coors Co.,* 624 F.2d 575 (5th Cir. 1980). If UMIC is seeking its reasonable attorneys' fees should LTV appeal to the Fifth Circuit, and, ultimately, to the United States Supreme Court, it is to file an affidavit setting forth the fees it anticipates incurring on appeal.

**38.** Because this court finds that T. O. Johnson and LTV had the requisite authority to make the Standby Commitment, UMIC's 10b–5 counterclaim against LTV and the individual directors is DISMISSED.